In People's Bank v. Ballowe, 34 La. Ann. 565, it was held by this court that:

"Where an injunction issues against executory process on the ground of extension of time by the plaintiff, the debtor's evidence must be positive and precise to show such fact."

[2] In Faries v. Ranger, Fatman & Co., 35 La. Ann. 104, it was held that:

"In the construction of an ambiguous contract, the safest mode is to ascertain the intention and meaning of the parties to the contract, as shown by their own acts, and by the manner in which they proceeded to the execution of the same."

In Breard v. Blanks, 51 La. Ann. 1507, 26 South. 618, it was held that:

"Where it is apparent that contracting parties have not understood each other, their rights in the subject-matter of the contract will be determined from their acts and deeds with reference thereto, and not from their contradictory assertions of the agreement, given at the trial of a suit instituted for a settlement of their interests growing out of the contract."

See, also, Moore v. Beiseker, 147 Fed. 367, 77 C. C. A. 545; Long-Bell Lumber Co. v. Stump, 86 Fed. 574, 30 C. C. A. 264.

The rule thus stated as to the construction of contracts is equally applicable to the question of contract vel non. In the instant case we are of opinion that there was no contract. We do not enter upon the consideration of the case of Milliken & Farwell v. Sweet Home Co., Ltd., 123 La. 998, 49 South. 669, to which we are referred by counsel for the Moore Company, for the reason that it does not appear to us to be in point; the facts being essentially different from those here disclosed.

The judgment appealed from, which dissolved the injunction, is therefore affirmed.

(64 South. 993)

No. 20,325.

STATE ex rel. CASSIDY, Clerk of Criminal District Court, v. BAKER, Judge.

In re CASSIDY, Clerk of Criminal District Court.

(March 30, 1914. Rehearing Denied April 27, 1914.)

*(Syllabus by Editorial Staff.)*

ELECTIONS (§ 255*)—RETURNS—PRESERVATION OR DESTRUCTION OF BALLOTS.

Act No. 152 of 1898, § 21, provides that the third tally sheet prepared by commissioners of election, together with the ballots and a poll list, shall be returned to the ballot boxes, sealed by the commissioners, and delivered to the clerk of the court, to be by him safely preserved for six months; section 23 requires the clerk to receive the boxes containing the ballots and other papers provided for and retain them for six months, and, as soon as may be thereafter, to cause the ballots to be destroyed, without examining them or permitting them to be examined by any person whatsoever; section 44 makes it an offense punishable by fine and imprisonment for any person to violate any provision of that act. *Held,* that the clerk is not required to destroy the ballots at the expiration of six months where they are needed as evidence in a criminal prosecution of the election commissioners for frauds committed in the election, especially in view of the rule that statutes must receive a sensible construction, and that the spirit of the statute prevails over its letter.

[Ed. Note.—For other cases, see Elections, Cent. Dig. § 231; Dec. Dig. § 255.*]

Monroe and Sommerville, JJ., dissenting.

Application for writs of certiorari and prohibition by the State, on relation of Lawrence J. Cassidy, Clerk of Criminal District Court, against Hon. Joshua G. Baker, Judge of the Criminal District Court. Rule nisi recalled.

Dart, Kernan & Dart, of New Orleans, for relator. R. G. Pleasant, Atty. Gen., and Chandler C. Luzenberg, of New Orleans, for respondent.

PROVOSTY, J. An investigation by the grand jury of the parish of Orleans of the ballots and election returns of the election of November 5, 1912, resulted in the finding

of indictments against a large number of the election commissioners. The offense charged was the making of a false canvass and false return of the votes cast upon a certain constitutional amendment. The accused contended that "nothing in the law makes it the duty of the commissioner of election to count the votes upon constitutional amendments," and that therefore the indictment did not set forth any crime; and they filed a demurrer on that ground. This demurrer was sustained by the trial court, and eventually by this court. State v. Palanque et al., 133 La. 36, 62 South. 224.

What disposition is to be made of the ballots and election returns after an election is provided for by Act 152 of 1898, p. 271, as follows:

"Sec. 21. That the third tally sheet, together with the ballots and a poll list of the persons voting, shall be returned to the ballot box, which shall thereupon be sealed by the said commissioners, and the said ballot boxes containing the ballots and tally sheets and poll lists, as aforesaid, shall be delivered to the clerk of court to be by him safely preserved for a period of six months."

"Sec. 23. That the clerk of the court shall receive the boxes containing the ballots cast at any election and the other papers herein provided for sealed as hereinbefore provided, and shall retain them in his care for six months, and as soon as may be thereafter said officer shall cause said ballots to be destroyed without examining them or permitting them to be examined by any person whatsoever, and shall make an entry in the records of his office that they have been so destroyed."

The said six months, after which this law required the election ballots of said election of November 5, 1912, to be destroyed, expired on May 5, 1913, and, as the decision of this court sustaining the said demurrer was not handed down until May 13, 1913, the said six months expired pending the said prosecutions.

The grand jury had investigated said ballots and returns only in connection with the constitutional amendment. The law officers of the state—the Attorney General of the state and the district attorney for the parish of Orleans—believing that frauds had been committed in other connections at said election, presented to the court the following petition:

"(a) That they have been informed that on or about the 5th and 6th days of November, 1912, the election laws of the state were violated, and crimes committed, by many of the commissioners and clerks of election who officiated at the polls in the various precincts of the city of New Orleans on Tuesday, November 5, 1912, when an election was held to elect presidential electors, members of Congress, parish officials, judges, and various other officers.

"(b) That the said crimes consisted in false returns of said election being made by many of said commissioners and clerks.

"(c) That it is the duty of your petitioners to inquire, ex officio, into said facts, and to cause an investigation thereof to be made before your honor.

"(d) That, in order to make such investigation, there should be summoned before your honor Mortimer H. Wisdom, Louis Knop, and Samuel A. Montgomery, constituting the board of supervisors of elections of the parish of Orleans, also Lawrence J. Cassidy, clerk of the criminal district court of the parish of Orleans, who shall produce before your honor, for investigation, the ballot boxes used in said election, and that the votes therein contained should be counted in the presence of the court, in order to ascertain whether said crimes have been committed.

"(e) That the depositions of all of said witnesses as may hereafter be summoned should be taken in presence of the court.

"(f) Wherefore, the premises considered, your petitioners pray that summonses issue to Mortimer H. Wisdom, Louis Knop, Lawrence J. Cassidy, commanding them to appear before this honorable court on such a day as your honor may select, and to appear from time to time thereafter until discharged, in order that their depositions may be taken as above shown. Petitioners further pray that the said Lawrence J. Cassidy, clerk of the criminal district court of the parish of Orleans, be ordered to bring before the court the ballot boxes above referred to for investigation. Petitioners further pray that all of the ballots in said boxes cast for presidential electors, Congressmen, parish officials, judges, and various other officers be counted, in order to ascertain whether false and fraudulent returns thereof were ever made to the board of supervisors of elections of the parish of Orleans, and to the Secretary of State, or either of them."

The criminal proceeding sought to be set on foot by this petition is expressly authorized by section 1018, Rev. Stat. The petition was presented to Judge Joshua G. Baker, the

same who is respondent in the present suit. He refused to grant the order prayed for, being of opinion that the said section 1018 had been repealed, and that, at any rate, his court was not the court having jurisdiction in the premises; it not being authorized to hold preliminary examinations. The matter came to this court on application of the Attorney General for a mandamus, and this court made the mandamus peremptory. State ex rel. Atty. Gen. v. Baker, Judge, 133 La. 919, 63 South. 403. In disposing of the case, this court said:

"From the very beginning of our state government, prosecutions for offenses in Louisiana have been by indictment or information. Under article 9 of our present Constitution, all offenses, except capital crimes, may be prosecuted by information. There is no essential difference between an indictment and an information. Both are formal accusations in the name of the state for alleged violations of her penal statute. The grand jury has the assistance of the court in securing the attendance of witnesses and the production of documentary evidence. There is no good reason why the state's prosecuting officers should not have like assistance, when informed of the commission of a crime or misdemeanor. Section 1018 of the Revised Statutes of 1870 was originally enacted in 1817 for the express purpose of enabling the state's prosecuting officers to inquire into the fact of the alleged commission of a crime or misdemeanor. In making a request for the summoning of witnesses for the purposes of such an inquiry, the prosecuting officer occupies the same position as the grand jury, and like that body is a part of the court for the administration of the criminal laws of the commonwealth. Section 1018 makes it the duty of the Attorney General, or the district attorney for the parish of Orleans, to inquire ex officio into the fact of the commission of crimes and to cause witnesses to be summoned before 'some judge or justice of the peace' to the end that their depositions may be taken. While the statute might be construed to include any judge or justice in the country parishes, in the parish of Orleans it must be limited to judges exercising criminal jurisdiction, because the inquiry is a preliminary step to a criminal prosecution. Between judges exercising such jurisdiction, the finger of the statute points to the judge who has jurisdiction of the offense sought to be investigated. In the instant case this is the respondent judge, and not the judge of one of the city criminal courts.

"Considering the petition of the relators to the judge below as a preliminary step in the prosecution of an offense within the jurisdiction of his court, we find no difficulty in reaching the conclusion that our learned brother erred in declining jurisdiction in the premises."

Judge Baker then, in obedience to the mandamus, issued the order, and the clerk of court, instead of complying with it, made a return assigning the following reasons why he should be dispensed from doing so, to wit:

"(1) That the proceeding herein taken is without warrant of law and unknown to the practice governing this court, and that the court has no jurisdiction to entertain the same, nor right or power whatsoever in the premises.

"(2) That this court is without jurisdiction over respondent, and without right or power to order respondent to produce the said ballot boxes and to submit the contents thereof to inspection for the reason hereinafter given, and for the further reason that no case or action is pending before your honor wherein your honor is authorized to issue any such order to appearer.

"(3) That in any event, under the terms and provisions of Act 152 of 1898, and particularly sections 21 and 23 thereof, the court is without power to open said ballot boxes, or to order appearer to open the same or to inspect the contents thereof, or to require respondent so to do, or require or permit any other person to inspect the contents of the said boxes. That the said boxes are not in the custody of the court but in the custody of appearer, and the said boxes are by the statute placed in the custody of appearer, and not in the custody of the court.

"(4) That by sections 21 and 23 of said Act 152 of 1898 respondent is made the legal custodian of said ballots and returns, and is required to preserve them for a space of six months and then to cause them to be destroyed, without examining them or permitting them to be examined by any person whatsoever, and that by section 44 of said act it is made an offense punishable by fine and imprisonment for any person to violate any of the provisions of said act, and that "appearer is advised by counsel and believes that the proceeding herein taken against him and the orders requested in the premises are beyond the power, right, and jurisdiction of this court, and are contrary to the provisions of the laws of the state of Louisiana, and they are not such orders as the appearer is bound to obey, and as will protect appearer from prosecution for violation of his sworn duty in the premises; and appearer is advised by counsel and believes it would be a violation of his official oath and duty to allow the said ballot boxes to be opened and inspected by any one whatsoever."

The respondent judge overruled these objections, and thereupon the clerk applied to this court for a prohibition against any further proceeding in the matter, and this appli-

cation for prohibition is the matter presently to be considered. The application is based upon the same grounds urged before the respondent judge.

Under our Constitution and laws, criminal prosecutions may be by indictment or information; the one presentment being by a grand jury, the other by the Attorney General or the district attorney. In the case of State ex rel. Attorney General v. Baker, Judge, supra, this court, after very full consideration announced, as appears from the excerpt, supra, that the said section 1018, Rev. Stat., was designed to provide the Attorney General and the district attorney with the same means of inquest, inquiry, investigation, and examination as is possessed by a grand jury for the discovery and prosecution of crime; and the court assimilated the inquiry or inquest set on foot by a petition of the Attorney General under said section 1018, R. S., to an investigation carried on by a grand jury. The court also decided in that case, as appears from the same excerpt, supra, that the court of the respondent judge has jurisdiction to entertain and act upon such a petition.

In the instant case, therefore, the relator, by questioning the jurisdiction of the respondent judge in the premises, and by denying that there is pending before his court any proceeding as an incident to which the order complained of might be made, is doing nothing more nor less than asking this court to reopen the issues considered and determined in that case. This court is not disposed to reopen the discussion, but considers the said decision authoritative and final on those points.

The suggestion of the relator that his failing to destroy the said ballots, but allowing them to be examined, will constitute on his part a violation of said Act 152 of 1898, subjecting him to fine and imprisonment under section 44 of said act, and that the order of the court will not be a protection to him

against a prosecution for such offense, is but a begging of the question. Said order will be a protection or not accordingly as it shall have been lawfully issued or not, and the latter question depends upon whether the relator is or not well founded in his contention that section 23 of Act 152 of 1898 hereinabove transcribed requires said ballots to be destroyed, even though needed as evidence in a criminal prosecution of the election commissioners for frauds committed in the election.

We agree with the learned respondent judge that, so long as the right to prosecute for the crime is not prescribed, the right of the state to preserve the evidence by which the commission of the crime is to be established cannot possibly be prescribed. In other words, that it would be putting an entirely unreasonable and inadmissible construction upon said statute, and giving it an operation certainly never contemplated by the Legislature, to hold that the evidence by which a crime is to be established, and the criminal brought to justice, is to be destroyed. True, the statute apparently so requires; but there could not possibly be any reason for such a thing, whereas, there stands against it an obvious and most powerful, reason, a reason of paramount importance to society, that the evidence of a crime should not be destroyed, and therefore we repeat that to hold that these ballots, actually and presently needed as they are as evidence in a criminal proceeding set on foot by the law officers of the state, should be destroyed would be to adopt a construction manifestly never contemplated by the Legislature.

The rule of construction in such a case is stated in the L. R. A. Dig. of U. S. Sup. Court Reports, as follows:

"All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the Legisla-

ture intended exceptions to its language which would avoid results of that character. The reason of the law, in such cases, should prevail over the letter."

In support of this rule of construction, some 100 or so cases are cited, among which are those of Kent v. Mojonier, 36 La. Ann. 261; Wolfe v. Joubert, 45 La. Ann. 1105, 13 South. 806, 21 L. R. A. 772; and State v. Bolden, 107 La. 117, 31 South. 393, 90 Am. St. Rep. 280. There is cited, also, Church of the Holy Trinity v. U. S., 143 U. S. 458, 12 Sup. Ct. 511, 36 L. Ed. 227, from which we make the following excerpt:

"It must be conceded that the act of the corporation is within the letter of this section, for the relation of rector to his church is one of service, and implies labor on the one side with compensation on the other. Not only are the general words 'labor' and 'service' both used, but also, as it were to guard against any narrow interpretation and emphasize a breadth of meaning, to them is added 'of any kind'; and, further, as noticed by the circuit judge in his opinion, the fifth section, which makes specific exceptions, among them professional actors, artists, lecturers, singers, and domestic servants, strengthens the idea that every other kind of labor and service was intended to be reached by the first section. While there is great force to this reasoning, we cannot think Congress intended to denounce with penalties a transaction like that in the present case. It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. This has been often asserted, and the reports are full of cases illustrating its application. This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act. As said · in Plowden, 205: 'From which cases it appears that the sages of the law heretofore have construed statutes quite contrary to the letter in some appearance, and those statutes which comprehend all things in the letter they have expounded to extend to but some things, and those which generally prohibit all people from doing such an act they have interpreted to permit some people to do it, and those which include every person in the letter they have adjudged to reach to some persons only, which expositions have always been founded upon the intent of the Legislature, which

they have collected sometimes by considering the cause and necessity of making the act, sometimes by comparing one part of the act with another, and sometimes by foreign circumstances.'

"In Margate Pier Co. v. Hannan, 3 Barn. & Ald. 266, C. J. Abbott quotes from Lord Coke as follows: 'Acts of Parliament are to be so construed as no man that is innocent or free from injury or wrong be, by literal construction, punished or endamaged.' In the case of State v. Clark, 29 N. J. Law, 96, 99, it appeared that an act had been passed making it a misdemeanor to willfully break down a fence in the possession of another person. Clark was indicted under that statute. The defense was that the act of breaking down the fence, though willful, was in the exercise of a legal right to go upon his own lands. The trial court rejected the testimony offered to sustain the defense, and the Supreme Court held that this ruling was error. In its opinion the court used this language: 'The act of 1855, in terms, makes the willful opening, breaking down, or injuring of any fences belonging to or in the possession of any other person a misdemeanor. In what sense is the term "willful" used? In common parlance, willful is used in the sense of intentional, as distinguished from accidental or involuntary. Whatever one does intentionally he does willfully. Is it used in that sense in this act? Did the Legislature intend to make the intentional opening of a fence for the purpose of going upon the land of another indictable, if done by permission or for a lawful purpose? * * * We cannot suppose such to have been the actual intent. To adopt such a construction would put a stop to the ordinary business of life. The language of the act, if construed literally, evidently leads to an absurd result. If a literal construction of the words of a statute be absurd, the act must be so construed as to avoid the absurdity. The court must restrain the words. The object designed to be reached by the act must limit and control the literal import of the terms and phrases employed.' In U. S. v. Kirby, 74 U. S. (7 Wall.) 482, 486, 19 L. Ed. 278, 280, the defendants were indicted for the violation of an act of Congress providing 'that if any person shall knowingly and willfully obstruct or retard the passage of the mail, or of any driver or carrier, or of any horse or carriage carrying the same, he shall, upon conviction, for every such offense pay a fine not exceeding one hundred dollars.' The specific charge was that the defendants knowingly and willfully retarded the passage of one Farris, a carrier of the mail, while engaged in the performance of his duty, and also in like manner retarded the steamboat General Buell, at that time engaged in carrying the mail. To this indictment the defendants pleaded specially that Farris had been indicted for murder by a court of competent authority in Kentucky; that a bench warrant had been issued and placed in the hands of the defendant Kirby, the sheriff of the county, commanding him to arrest

Farris and bring him before the court to answer to the indictment; and that, in obedience to this warrant, he and the other defendants, as his posse, entered upon the steamboat General Buell and arrested Farris, and used only such force as was necessary to accomplish that arrest. The question as to the sufficiency of this plea was certified to this court, and it was held that the arrest of Farris upon the warrant from the state court was not an obstruction of the mail, or the retarding of the passage of a carrier of the mail, within the meaning of the act. In its opinion the court says: 'All law should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the Legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter. The common sense of man approves the judgment mentioned by Puffendorf, that the Bolognian law, which enacted "that whoever drew blood in the street should be punished with the utmost severity," did not extend to the surgeon who opened the vein of a person that fell down in the street in a fit. The same common sense accepts the ruling, cited by Plowden, that the statute of 1st Edward II, which enacts that a prisoner who breaks prison shall be guilty of felony, does not extend to a prisoner who breaks out when the prison is on fire, "for he is not to be hanged because he would not stay to be burnt." And we think that a like common sense will sanction the ruling we make that the act of Congress which punishes the obstruction or retarding of the passage of the mail, or of its carrier, does not apply to a case of temporary detention of the mail caused by the arrest of the carrier upon an indictment for murder.' The following cases may also be cited: Henry v. Tilson, 17 Vt. 479; Ryegate v. Wardsboro, 30 Vt. 746; Ex parte Ellis, 11 Cal. 222; Ingraham v. Speed, 30 Miss. 410; Jackson v. Collins, 3 Cow. (N. Y.) 89; People v. Utica Co., 15 Johns. (N. Y.) 358, 8 Am. Dec. 243; Burch v. Newbury, 10 N. Y. 374; People v. N. Y., 95 N. Y. 554, 558; People v. Lacombe, 99 N. Y. 43, 49, 1 N. E. 599; Chesapeake & O. Canal Co. v. Baltimore & O. R. Co., 4 Gill & J. (Md.) 152; Osgood v. Breed, 12 Mass. 525, 530; Wilbur v. Crane, 13 Pick. (Mass.) 284; Oats v. First National Bank of Montgomery, 100 U. S. 239, 25 L. Ed. 580."

A case closely analogous with the one at bar is Riggs v. Palmer, 115 N. Y. 506, 22 N. E. 188, 5 L. R. A. 340, 12 Am. St. Rep. 819, where the murderer of the decedent was denied the right to inherit, though the express terms of the statute gave it to him unqualifiedly.

Illustrative instances could easily be multiplied; the books are full of them.

We recognize, of course, that this rule of construction can have application only in a plain or, let us say, glaring case; but the present case appears to us to be eminently and clearly of that character. The idea that it should be the legal duty of an officer of the state to destroy the evidence of a crime the prosecution of which has already begun, which evidence he happens to have in his possession, is repugnant to our every notion of well-ordered society; it shocks the moral sense; in fact, involves a moral absurdity. The Legislature cannot be supposed to have intended to authorize the course of criminal justice to be thwarted in that manner; to have intended to impose upon one of its officers the legal duty to perform an act striking thus directly at the good order of society. Statutes, unquestionably, are to be obeyed in their requirements; but society is not easily to be supposed to have intended thus to disarm itself in its incessant contest with the forces of evil and crime.

Another rule of construction which saves said statute from operating as an obstruction to the administration of criminal justice is stated in 36 Cyc. 1171, as follows:

"The state, or the public, is not to be considered as within the purview of a statute, however general and comprehensive the language of such act may be, unless expressly named therein, or included by necessary implication. This general doctrine applies with especial force to statutes by which prerogatives, rights, titles, or interests of the state would be divested."

"The state and the national government are not bound by a provision of a general statute which affects their prerogative rights or interests, unless expressly named or included by necessary implication." 26 A. & E. E. of L. p. 644.

A familiar example of the application of this rule is found in the statutes of prescription, which are uniformly held not to apply to the rights of the state, unless the state is expressly named.

In Dollar Savings Bank v. U. S., 19 Wall. 227, 22 L. Ed. 80, it was held that a statute which precluded an action for debt, for the recovery of taxes, prescribing a special and different mode of proceeding, did not apply to the government; the court saying:

"It is a familiar principle that the king is not bound by any act of Parliament, unless he is named therein by special and particular words. * * * The rule thus settled respecting the British crown is equally applicable to this government, and it has been applied frequently in the different states."

In City of Milwaukee v. McGregor, 140 Wis. 35, 121 N. W. 642, 17 Ann. Cas. 1002, it was held that city regulations for the construction of buildings did not apply to a building that was being erected for the state.

In U. S. v. Herron, 20 Wall. 251, 22 L. Ed. 275, it was held that a discharge in bankruptcy does not affect the claims of the United States.

Illustrations might be multiplied; but elaboration of the point can hardly be necessary. The very purpose of requiring the ballot boxes and their contents to be securely kept is, as held in Gonsoulin v. Decuir, 121 La. 611, 46 South. 668, that they may serve as evidence. In that case it was held that, under judicial supervision, they may be opened and examined as well before as after suit instituted. The inhibition against allowing any person whatsoever to examine them does not apply to the state acting through her law officers and judicial tribunals in the detection and punishment of crime. The state is not any person whatsoever when exercising her sovereign right of protecting and conserving the safety and good order of society. For this statute to apply to the state in such a case, it would have been necessary, under said rule of construction, that it should have named the state expressly; general words do not suffice.

Relator argues that the said Act 152 of 1898, which is the general election law, embodies the Australian ballot system, which has for its fundamental idea the preservation of the secrecy of the ballot, and that the said section 23 is but a carrying out of that idea, and that therefore it would be a violation, not only of its letter, but of the spirit or policy which dictated it, to permit these ballots boxes to be opened and their contents examined.

The answer to that argument is obvious. The secrecy of the ballot is desired simply as a means towards the purity of the election. To violate that secrecy, therefore, for the purpose of punishing those who may have committed a fraud in the election, is not to go counter to that policy but strictly in line with it. The secrecy is designed as a preventative measure; the retributive punishment is a repressive measure; both to the same end. This policy of secrecy does not stand in the way of the ballots being used as evidence in a contested election case before the expiration of the six months; why should it stand in the way of their being used as evidence in a criminal case after the expiration of the six months? The reason why the law requires them to be destroyed after six months is that they are then no longer needed as evidence; that reason fails entirely where they are needed as evidence in a criminal prosecution for a fraud committed in the election.

It may be well to mention that the delay in the decision of this case was caused mainly by the long illness of the writer of this opinion, whose return to the bench had to be waited for, as there was an equal division among the remaining four justices.

The rule nisi is recalled, at the cost of the relator.

BREAUX, C. J., concurs in the decree, and hands down reasons. See 64 South. 997. MONROE, J., dissents, and hands down reasons. See 64 South. 999. SOMMERVILLE, J., dissents.